UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___9/11/2020___
```

Gineen Hogans,

                                        Plaintiff,

                -against-

Commissioner of Social Security,

                                        Defendant.

1:19-cv-02737 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

On March 27, 2019, Plaintiff Gineen Hogans ("Plaintiff" or "Hogans") filed this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), and § 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), challenging the final decision of the Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB"). (Compl., ECF No. 1.) Presently before the Court is a joint stipulation in lieu of motions for judgment on the pleadings in which both Hogans and the Commissioner are seeking judgment on the pleadings. (Joint Stip., ECF No. 22.) For the reasons set forth below, judgment on the pleadings is GRANTED in favor of Hogans, and is DENIED as to the Commissioner, and the case is remanded for further proceedings.

**BACKGROUND**

I.    **Procedural Background**

On June 17, 2015, Plaintiff filed an application for DIB with an alleged onset date of January 1, 2015. (Administrative R. ("R."), ECF No. 14, 17.) Plaintiff's date last insured[1] is December 31, 2019. (R. 79.)[2] After Plaintiff's application was denied, Plaintiff requested a hearing. (R. 17, 96-97.) A video hearing was held before Administrative Law Judge ("ALJ") Anne Sharrard on October 23, 2017, with ALJ Sharrard appearing in Chicago, and Plaintiff appearing in New York. (R. 17.) ALJ Sharrard issued a decision denying the claim on February 9, 2018. (R. 17-29.) Plaintiff was 45 years old on the date of that decision. (R. 25.) On January 30, 2019, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 1-8.) Thus, the ALJ's decision is the Commissioner's final decision reviewable by this Court. 20 C.F.R. § 404.981; 42 U.S.C. § 405(g).

II.    **Non-Medical Evidence**

Hogans was born in 1972 and was 42 years old in January 2015. (R. 25.) She completed one year of college. (R. 36, 187.) She worked as a toll collector, first at the Triborough Bridge and Tunnel in 2005 and 2006, and then at the New Fulton Fish Markets from July 2006 to July 2014. (R. 37-38, 86, 187.)

---

[1] To qualify for disability insurance benefits, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (C); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI").

[2] In the ALJ's decision, the DLI was reported as March 31, 2020. (R. 19.)

### III.   Relevant Medical Evidence[3]

#### A.   Barry M. Katzman, M.D.

Hogans began treatment with Dr. Katzman, an orthopedic surgeon, in April 2013, after she sustained multiple injuries, including to both shoulders and her right knee, in a motor vehicle accident on March 5, 2013. (R. 54, 232.) Dr. Katzman diagnosed left shoulder bursitis[4]/tendonitis,[5] a possible rotator cuff tear and right knee internal derangement. (R. 233.) On November 15, 2013, she underwent a knee arthroscopy. (R. 241.) Between April 30, 2013 and January 1, 2015, Hogans's alleged onset date, Hogans regularly saw Dr. Katzman for treatment of her shoulders, with her primary complaint being left shoulder pain. (R. 232-45.) On several occasions, Dr. Katzman recommended left shoulder surgery. (R. 235-39.)

On January 5, 2015, Hogans returned to Dr. Katzman and reported that her left shoulder pain was "the same to worse." (R. 236.) Dr. Katzman noted that she had experienced some temporary relief with injection treatment.[6] (*Id*.) Dr. Katzman's examination findings regarding Hogans's left shoulder showed forward flexion to 90 degrees out of 180; a lot of pain by the

---

[3] The Court focuses on the medical evidence from on or after Hogans's alleged onset date of January 1, 2015. A summary of the medical evidence prior to that date is set forth in the Joint Stipulation, which the Court incorporates by reference.

[4] "Bursitis is inflammation of the bursa, which is a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." *See Lindo v. Saul*, No. 18-CV-01070 (SDA), 2019 WL 4784921, at *2 (S.D.N.Y. Sept. 30, 2019).

[5] Tendonitis is the inflammation of tendons and of tendon-muscle attachments. *See Calzada v. Astrue*, 753 F. Supp. 2d 250, 257 (S.D.N.Y. 2010).

[6] This statement is repeated in Dr. Katzman's reports through September 2015. (*See* R. 231, 234, 247, 259.) However, it is unclear from the summaries provided whether Hogans continued to receive injection treatment, or whether this note continues to refer to treatment provided prior to the January 5, 2015 examination.

biceps/labrum; no tenderness to palpation over the rotator cuff or AC joint;[7] no atrophy in the supra or infraspinatus fossas,[8] positive Neer's and Hawkins' signs;[9] and negative apprehension and cross body adduction signs. (*Id*.) He restated his recommendation for left shoulder surgery, and noted that Hogans was "now cleared for surgery." (*Id*.)

On February 3, 2015, Hogans was seen by Dr. Katzman and again complained that her left shoulder pain was worse, and reported numbness. (R. 234.) Dr. Katzman reiterated that she had experienced some temporary relief with injection treatment and stated that she needed a nerve study test. (*Id*.) His examination of her left shoulder reflected restricted forward flexion, to 80 degrees out of 180; a lot of pain by the biceps/labrum; no tenderness to palpation over the rotator cuff or AC joint; no atrophy in the supra or insfraspinatus fossas; positive Neer's and Hawkins' impingement signs; and negative apprehension and cross body adduction signs. (*Id*.)

Hogans returned to Dr. Katzman on June 2, 2015. (R. 247.) She complained of worsening left shoulder pain and numbness. (*Id*.) Dr. Katzman again noted that she experienced some temporary relief with injection treatment, that she needed a nerve study test, that Dr. Katzman had recommended left shoulder surgery, and that she wanted to proceed with the surgery. (*Id*.)

---

[7] The acromioclavicular joint, or AC joint is a joint between the clavicle and the scapula, *see Steven N. v. Berryhill*, No. 17-CV-00427 (CR), 2018 WL 6629681, at *5 (W.D.N.Y. Dec. 19, 2018), which facilitates shoulder movement. *See Mercado v. Colvin*, 15-CV-02283 (JCF), 2016 WL 3866587, at *2 (S.D.N.Y. July 13, 2016).

[8] The supraspinatus and infraspinatus each are a muscle of the shoulder joint, the tendon of which contributes to the rotator cuff. *See Wiebicke v. Astrue*, No. 10-CV-03371 (BSJ) (FM), 2012 WL 2861681, at *2 (S.D.N.Y. July 2, 2012).

[9] The Neer's and Hawkins' impingement tests commonly are used to test rotator cuff shoulder impingement. *See Albino v. Berryhill*, No. 18-CV-06514 (LGS) (HBP), 2019 WL 2477957, at *7 (S.D.N.Y. May 29, 2019), *report and recommendation adopted*, 2019 WL 2465139 (S.D.N.Y. June 13, 2019).

Dr. Katzman's examination of her left shoulder was consistent with his prior examination on February 3, 2015. (*Compare* R. 234 *with* R. 247.)

At a July 21, 2015 visit, Hogans reported to Dr. Katzman left shoulder pain and numbness. (R. 231.) Dr. Katzman again stated that she had some temporary relief with injection, but that her condition had worsened. (*Id.*) Upon examination of her left shoulder, Dr. Katzman observed forward flexion to 80 degrees out of 180; a lot of pain by the biceps/labrum; positive Neer's and Hawkins' signs; no tenderness to palpation over the rotator cuff or AC joint; no atrophy in the supra or insfraspinatus fossas; and negative apprehension and cross body adduction signs. (*Id.*)

Dr. Katzman saw Hogans for a follow up visit on September 29, 2015. (R. 259.) Dr. Katzman again noted her temporary relief with injection treatment, complaints of numbness and left shoulder pain, and need for a nerve study test. (*Id.*) Upon examination of her left shoulder, he observed further restricted forward flexion, to 50 degrees out of 180, and again documented a lot of pain by the biceps /labrum; positive Neer's and Hawkins' signs; no tenderness to palpation over the rotator cuff or AC joint; no atrophy in the supra or insfraspinatus fossas; and negative apprehension and cross body adduction signs. (*Id.*)

On November 10, 2015, Dr. Katzman performed on Hogans a left shoulder arthroscopy for left shoulder internal derangement. (R. 258, 346-48.) Dr. Katzman identified postoperative diagnoses of left shoulder labral tear[10] and bursitis. (*Id.*) The surgery notes reflect that the rotator cuff was inspected during surgery and "found to be intact." (R. 348.)

---

[10] The labrum is the cup-shaped rim of cartilage that lines and reinforces the ball and socket joint of the shoulder, which is comprised of the glenoid—the shallow shoulder socket—and the head, or ball, of the upper arm bone known as the humerus. The labrum is the attachment site for the ligaments and supports the ball and socket joint along with the rotator cuff tendons and muscles. It contributes to shoulder stability and, when torn, can lead to partial or complete shoulder dislocation. Stephen Fealy, M.D.,

Dr. Katzman examined Hogans on November 17, 2015, a week after surgery. (R. 344.) Upon examination of her left shoulder, Dr. Katzman observed forward flexion to 90 degrees actively, out of 180. (*Id*.) He noted that she would start physical therapy. (*Id*.)

The same day, Dr. Katzman completed a Medical Source Statement of Ability to do Work-Related Activities. (R. 326-38.) Dr. Katzman opined that Hogans could not lift or carry. (R. 326.) He also assessed that she could sit, stand and walk for 3 hours in an 8-hour day; occasionally reach, handle, finger, feel, push and pull with her right hand; occasionally feel with her left hand, but never reach, handle, finger, push or pull with her left hand; occasionally climb, balance, stoop, kneel, crouch, and crawl; and never be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes or pulmonary irritants, or operate a motor vehicle. (R. 332-34.) In addition, Dr. Katzman opined that she could not shop, travel without a companion for assistance, walk a block at a reasonable pace on rough or uneven surfaces, prepare simple meals, sort, handle, or use paper or files. (R. 338.) Finally, Dr. Katzman noted that the stated limitations began August 23, 2014, and had lasted or would last for 12 consecutive months. (*Id*.)[11]

During a visit with Dr. Katzman on March 15, 2016, Hogans reported to him that she felt better post-surgery, but still had some pain. (R. 343.) On examination, Dr. Katzman documented left shoulder forward flexion to 90 degrees actively out of 180. (*Id*.) He recommended that she continue physical therapy. (*Id*.)

---

*Shoulder Labrum Tears: An Overview*, Hospital for Special Surgery (Nov. 23, 2010), https://www.hss.edu/conditions_shoulder-labrum-tears-overview.asp.

[11] The November 17, 2015 record from Dr. Katzman states that he would "see the patient back in [his] office in three weeks' time." (R. 344.) However, there is a gap in the Administrative Record and there are no records from Dr. Katzman between November 18, 2015 and March 14, 2016.

Hogans again saw Dr. Katzman on April 19, 2016 and reported that she was feeling better, but was still in some pain. (R. 342.) Dr. Katzman observed forward flexion in the left shoulder to 120 degrees actively, out of 180. (*Id*.) He recommended that she continue physical therapy. (*Id*.)

B.    **New York Spine Specialist Practice Group**

Between at least June 2013 and May 2016, Hogans received treatment from Dr. Demetrios Mikelis and other providers at the New York Spine Specialist Practice Group for neck and back pain. (R. 280-319, 377-80.) In addition, on July 23, 2014, Dr. Sebastian Lattuga, an orthopedic surgeon with the same practice group, performed a cervical discectomy and fusion on Hogans. (R. 293, 301-04.)

After the alleged onset date, in February 2015, Dr. Mikelis noted that Hogans was improving post-operatively, following her July 2014 procedure, but continued to have pain and some symptoms consistent with pre-operative conditions. (R. 291.) Dr. Mikelis also reported that she was not currently receiving physical therapy, but performed a home exercise program. (*Id*.) She complained of neck pain with bilateral numbness and tingling in the upper extremities. (*Id*.) Upon examination, Dr. Mikelis observed tenderness, spasm and a restricted range of motion in her cervical spine. (*Id*.) Dr. Mikelis provided a diagnosis of status post-anterior cervical discectomy and fusion and opined that Hogans must remain out of work for at least 6 more weeks. (R. 291-92.) He stated that she was given a brace and a referral to physical therapy and pain management. (R. 292.) Dr. Mikelis recommended that she refrain from activities that exacerbate symptoms such as lifting, carrying, bending and twisting. (*Id*.)

On April 21, 2015, D.O. Andrew Cordiale, another member of the New York Spine Specialist practice group, noted the same observations, complaints, findings and

recommendations that Dr. Mikelis had recorded in February 2015. (R. 288-89.) On July 17, 2015, Hogans had a follow-up visit with D.O. Cordiale, and complained of neck pain with bilateral numbness and tingling in the upper extremities. (R. 286.) D.O. Cordiale again noted that she was improving post-operatively, but continued to have pain and some symptoms consistent with pre-operative conditions. (*Id*.) Upon examination, D.O. Cordiale noted tenderness, spasm and a restricted range of motion in the cervical spine. (*Id*.) D.O. Cordiale prescribed Flexeril and recommended that she continue physical therapy and a home exercise program and continue to refrain from activity that exacerbates symptoms, such as lifting, carrying, bending and twisting. (R. 287.)

Hogans attended two follow-up appointments with Dr. Lattuga in September 2015, one on September 4 and one on September 30. (R. 282-85.) During both, she complained of chronic neck and low back pain radiating into the extremities. (R. 282, 284.) She rated her pain as a 5-9 out of 10. (*Id*.) She reported that her neck pain had improved, but that she continued to have residual pain and symptoms consistent with her condition prior to her July 2014 procedure. (*Id*.) Hogans also noted that her pain was worse with lifting, carrying, bending and sitting for prolonged periods, and that she avoided those activities. (*Id*.) Upon examination at both appointments, Dr. Lattuga observed tenderness, spasm and restricted ranges of motion in her cervical and lumbar spine. (*Id*.) He diagnosed Hogans with lumbar radiculopathy, in addition to her prior diagnosis of status post-anterior cervical discectomy and fusion, and recommended physical therapy and a home exercise program. (R. 283, 285.)

At a December 14, 2015 visit with Dr. Mikelis, Hogans reported the same symptoms as at her visits with Dr. Lattuga in September 2015. (R. 280.) Upon examination, Dr. Mikelis observed tenderness, spasm and restricted ranges of motion in the cervical and lumbar spine. (*Id*.) He recommended physical therapy and prescribed tizanidine. (R. 281.) On December 14, 2015, Dr. Mikelis opined that she was totally disabled. (R. 340.) He noted that Hogans was seen in his office that day and requested that she be excused from work or school. (*Id*.) He listed diagnoses of cervical and lumbar radiculopathy. (*Id*.)

On March 16, 2016, Hogans returned to Dr. Mikelis, and repeated the same complaints as in September and December 2015. (R. 379.) Dr. Mikelis noted tenderness, spasm and restricted ranges of motion in the cervical and lumbar spine. (*Id*.) He recommended that she continue physical therapy and a home exercise program and referred her to pain management. (R. 380.)

Hogans next visited Dr. Mikelis on May 4, 2016, and again reported symptoms consistent with her September 2015, December 2015 and March 2016 visits, including chronic neck and low back pain radiating into her extremities, with numbness and tingling in the upper extremities. (R. 377.) Upon examination, Dr. Mikelis noted tenderness, spasm and restricted ranges of motion in her cervical and lumbar spine. (*Id*.) He recommended that she continue physical therapy and a home exercise program and noted that she wished to discuss pain management treatment with her primary care provider. (R. 378.)

### C.    Dr. Hymavati Devi Kavuri

On October 13, 2016, Hogans attended her first appointment with primary care provider Dr. Kavuri. (R. 418-35.) She recounted to Dr. Kavuri a history of gastroesophageal reflux disease

(GERD), asthma, limited mobility and chronic pain following a motor vehicle accident, and complained of arthralgias and neck pain. (R. 419, 422.) Hogans told Dr. Kavuri that she had a history of asthma; that she typically treated asthma with Albuterol and Dulera, but had recently run out of Dulera; that she recently had experienced increasingly frequent asthma symptoms while "off" Dulera; and that Dulera had been helpful in the past. (R. 419-20.) She denied nighttime asthma symptoms and described three asthma exacerbations that required steroids. (R. 420.) Hogans reported a history of migraines since her accident, accompanied by aura and photosensitivity, which she stated recently had worsened. (R. 419-20.) She stated that the migraines occurred every three days and that Tylenol and Advil had not provided relief. (R. 420.)

Upon examination, Dr. Kavuri observed no acute distress; clear lungs, with no crackles, rhonchi or wheezing; a limited range of motion in the neck; a full range of motion of all other joints; and tenderness at the cervical and lumbar spine and bilateral shoulders. (R. 423.) Dr. Kavuri diagnosed "[c]hronic pain following trauma"; asthma, with poor control off medications; migraine headaches; and GERD. (R. 419.) Regarding Hogans's chronic pain, Dr. Kavuri noted that Hogans was on an "unusual combination of muscle relaxants, but has found her routine with them effective for a while now," and that she was interested in trying acupuncture. (R. 419.) Dr. Kavuri recommended that she restart Dulera, undergo a trial of Sumatriptan for her headaches, and continue with Cyclobenzaprine and Tizanidine. (R. 419, 423.)

Hogans had a follow-up visit with Dr. Kavuri on January 4, 2017. (R. 436-52.) She complained of parasthesias[12] in her toes, arthralgias, and neck and back pain, but noted that the

---

[12] "Parasthesias" refers to "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 406 (S.D.N.Y. 2010) (citation omitted).

Tizanidine helped with sleep and that Cyclobenzaprine provided moderate pain relief during the day. (R. 437, 440.) She also complained again of daily migraine headaches. (R. 437.) She advised Dr. Kavuri that she had issues filling the prescription of Sumatriptan that Dr. Kavuri had prescribed at her previous visit. (*Id*.) Hogans reported that her asthma had improved from her last visit, but still was not well controlled. (*Id*.) She advised Dr. Kavuri that she had been using Dulera regularly after her prior visit, but also taking Albuterol "more prophylactically" because she believed the cold weather had been triggering her asthma. (*Id*.)

On examination, Dr. Kavuri observed clear lungs and chest, with no crackles, rhonchi or wheezing; a limited range of motion in the neck; a full range of motion in all other joints; and tenderness in the spine and shoulders. (R. 440.) Dr. Kavuri prescribed Riboflavin and magnesium for Hogans's migraines, and recommended a trial of acupuncture, physical therapy and restorative yoga for her neck pain. (R. 441.) With respect to her asthma, Dr. Kavuri recommended taking Albuterol only in response to symptoms, rather than prophylactically, to assess the effectiveness of Dulera. (R. 440.)

On June 1, 2017, Hogans returned to Dr. Kavuri. (R. 453-67.) She reported symptoms of back pain, neck pain and headaches. (R. 455.) She stated that the Cyclobenzaprine and Tizanidine had provided moderate relief for her neck pain, and that, although she had obtained a referral for acupuncture, she was not able to attend an acupuncture appointment due to transportation issues. (R. 454.) Hogans reported that she still experienced migraines 2 to 3 times per week and did not feel that the Riboflavin helped much. (*Id*.) With respect to her asthma, she advised Dr. Kavuri that she had been taking Dulera regularly and using Albuterol a few times a month, and that her asthma was "better controlled," without nighttime symptoms. (R. 454, 457.)

Upon examination, Dr. Kavuri observed clear lungs, with no crackles, rhonchi or wheezing; a limited range of motion in the neck; a full range of motion in all other joints; cervical, lumbar and paraspinal tenderness; and tenderness in the shoulders. (R. 456-57.) Dr. Kavuri provided Hogan refills for Tizanidine and Cyclobenzaprine. (R. 454, 457.) Because she did not report experiencing meaningful relief for her migraines with Riboflavin, Dr. Kavuri prescribed a different migraine medication, Propranalol, and suggested Hogans try treating her migraines with acupuncture as well. (*Id*.)

Dr. Kavuri completed a Medical Source Statement for Hogans on June 1, 2017. (R. 320-25.) She indicated that, at the time of completing the statement, she had been treating Hogans for 8 months and had treated Hogans twice. (R. 320.) Dr. Kavuri listed diagnoses of anterior cervical discectomy and fusion at C5-C6 in 2014, lumbar radiculopathy with HNP,[13] right knee arthroscopy and left shoulder surgery in 2015, status post car accident. (*Id*.) Asked how often Hogans experienced pain severe enough to interfere with her attention and concentration, Dr. Kavuri checked the field for "Often." (R. 321.) In response to a question regarding the degree to which Hogans was limited in the ability to deal with work stress, Dr. Kavuri checked "Marked limitation." (*Id*.) Asked to identify any side effects of Hogans's medication, Dr. Kavuri listed drowsiness. (*Id*.)

Dr. Kavuri opined that Hogans could only sit, stand or walk continuously for less than 15 minutes before alternating postures; could only stand or walk less than one hour in an 8-hour day; could only occasionally balance, reach, handle, and finger; and could never lift and carry

---

[13] "HNP" refers to herniated nucleus polposus or, more simply, a herniated disc. *See Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 76 (N.D.N.Y. 2005).

more than 5 pounds, stoop or posture her neck. (R. 321-23.) She assessed that Hogans could sit for more than 6 hours in an 8-hour day, but also opined that Hogans would need to rest or lie down more than 6 hours in an 8-hour work day. (R. 322-23.) As a result of Hogans's impairments or treatments, Dr. Kavuri opined, Hogans would be absent from work more than 3 times a month. (R. 325.) Dr. Kavuri noted that Hogans's condition had existed and persisted since March 2015. (*Id.*)

In a letter, dated October 18, 2017, Dr. Kavuri, reported that Hogans "suffers from significant pain" as a result of her 2013 car accident, 2014 discectomy and fusion and 2015 left shoulder arthroscopy, and was currently taking "tizanidine and baclofen for some moderate relief." (R. 473.) Further, Dr. Kavuri stated that Hogans "also suffers from significant migraines as a result of the mechanical trauma and has failed prophylactic medications and is trialing a third." (*Id.*) Dr. Kavuri observed that Hogans's "pain and migraines are debilitating to her everyday functioning." (*Id.*) Dr. Kavuri stated she last saw Hogans on October 18, 2017. (*Id.*)

### D.   Dr. Sharon Revan – August 2015 Consultative Examination

Dr. Revan conducted a consultative examination of Hogans on August 21, 2015. (R. 252-55.) Dr. Revan noted that Hogans was in no acute distress and had a normal gait and stance. (R. 253.) Her squat was full, with holding on, and she could walk on heels and toes without difficulty, rise from a chair without difficulty, and needed no help getting on and off the examination table. (*Id.*) Hogans's chest and lungs were clear to auscultation.[14] (R. 254.)

---

[14] Auscultation is the process of listening to the sounds made by the various body structures as a diagnostic method. *See Daley v. Berryhill*, No. 16-CV-02246 (PGG) (JLC), 2017 WL 3208030, at *5 (S.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2017 WL 4236566 (S.D.N.Y. Sept. 24, 2017).

Dr. Revan observed a limited range of motion in Hogans's cervical and lumbar spine and shoulders, and a full range of motion in the left hip, elbows, forearms, wrists, knees, and ankles. (R. 254.) Dr. Revan noted mid to low back pain with palpation, bilateral hip pain and positive straight leg raising. (*Id*.) Dr. Revan also noted 5/5 strength and no muscle atrophy in the extremities; stable and nontender joints; no sensory deficits; 5/5 grip strength; and intact hand and finger dexterity. (*Id*.)

Dr. Revan diagnosed Hogans with neck and shoulder pain and asthma. (R. 255.) She opined that Hogans had mild to moderate limitations with upper extremities for gross motor activities; mild to moderate limitations with walking and standing due to back pain; limitation with standing due to balance; and mild to moderate limitations with personal grooming and activities of daily living secondary to her back pain. (*Id*.)

**IV.**     **The October 23, 2017 Administrative Hearing**

    **A.**     **Plaintiff's Testimony**

At the administrative hearing on October 23, 2017, Plaintiff testified that she worked as a toll collector at the Triborough Bridge and Tunnel and then at the New Fulton Fish Markets. (R. 37-38.) Her job ended because she had to take too many days off, and she could not perform her job duties as they were required. (R. 40.) Plaintiff stated that was getting migraines and cried all the time, that her body was in excruciating pain and that her neck, shoulder and knee were bothering her. (R. 41.)

Plaintiff had arthroscopy of her left shoulder. (R. 41.) Plaintiff also has a rotator cuff and a labral tear on her left shoulder. (R. 42.) She testified that she still gets pain from it and still has weakness in her arm. (*Id*.) She also has "a lot of things that are wrong with [her] neck and [her]

muscles." (R. 42-43.) With her left shoulder, she cannot carry things. (R. 43.) She gets numbness, pins and needles in both hands and feet. (R. 43, 44.) Plaintiff has difficulty reaching with her left arm to her back. (R. 43.) When she was at her doctor, her hands were shaking and unstable. (R. 45.) She had numbness in her wrists. (*Id*.) The numbness and pins and needles started about two years ago. (R. 47.) Plaintiff gets migraines 2 to 3 times a day, and they last 1 to 2 hours, but then she takes some pills and goes to sleep. (R. 50, 52.) The migraines started in March 2013. (R. 50.)

Plaintiff testified that Dr. Kavuri has been treating her for almost a year. Plaintiff sees her every 2 to 3 months. (R. 54.) Dr. Katzman is Plaintiff's orthopedist, who performed surgeries on her shoulder and knee. (*Id*.)

Plaintiff testified that she has problems with moving her neck. (R. 55.) Her lower back hurts a lot, but she is afraid to do another surgery. (R. 56.) She cannot bend over and pick up things. (*Id*.) Plaintiff stated that she has two herniated discs in her lower back. (*Id*.) Plaintiff wears a brace on her lower back. (*Id*.) She cannot jog, run or ride a bike. (*Id*.) Plaintiff can walk or stand for about 15 minutes, but then she has to sit. (R. 57-58.) When she is in large crowds or standing on a platform, she feels like everything is swaying. (*Id*.) Plaintiff tries not to sit. (R 58.) Plaintiff stated that she was sitting forward at the hearing because if she leans all the way back, her head hurts. (*Id*.)

Plaintiff's children do most of the household chores. (R. 61.) She can lift 5 to 7 pounds. (R. 63.) She is right-handed and has problems reaching overhead with her left hand. (R. 64.) Plaintiff gets spasms between her shoulder and neck. (R. 66.) Plaintiff takes Baclofen, Tizanidine and Gabapentin for pain. (R. 67.) The medications help, but she still has some pain. (*Id*.) She has no side effects from the medications. (R. 68.)

### B.    <u>Vocational Expert Testimony</u>

Vocational Expert ("VE") Jacqueline Bethell also testified at the hearing. (R. 68-78.) The ALJ asked the VE whether there was work available to a person of Plaintiff's age, education, and work history, who was limited by two different sets of hypothetical restrictions. (R. 70-72.) In the first hypothetical, the ALJ described a person who could lift and carry 20 pounds occasionally and 10 pounds frequently; sit for six hours; stand and/or walk for four hours; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, stoop, crouch, kneel, crawl and balance; frequently reach, push and pull with the left upper extremity; frequently push or pull with the lower extremities; frequently rotate and flex the neck; and have occasional exposure to extreme heat and extreme cold. (R. 70.) The VE testified that such a person could perform Plaintiff's past relevant work as a toll collector as the job is generally performed, but not as the job was performed by Plaintiff. (R. 71.) The VE also testified that such a person could perform three light exertion jobs. (*Id*.)

In the second hypothetical, the ALJ specified that the person would require all the limitations noted in the first hypothetical, but would be limited to standing and/or walking for two hours, rather than four. (R. 71-72.) The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform the following three sedentary jobs: cutter/paster, call out operator and document specialist. (R. 72.) The ALJ then asked the VE if a person with the restrictions in either hypothetical could perform any jobs if she were off-task 15 percent or absent two days per month consistently. (R. 72-73.) The VE responded that no jobs would exist for such a person. (*Id*.)

Plaintiff's counsel asked the VE whether the first hypothetical posed by the ALJ, involving four hours of standing and/or walking per day, met the definition of "light work," given that it involved less than six hours of standing and walking. (R. 73.) The VE stated that she "would look at" light work as involving "standing and walking no more than six hours." (*Id*.) The ALJ noted that the definition of light work listed in the regulations states that light work involves "a good deal of walking or standing," but does not specify the number of hours of standing or walking required, and read that definition aloud. (R. 73-74.)

Plaintiff's counsel then posed a different hypothetical to the VE. (R. 77.) He asked whether a person with the restrictions described in the ALJ's second hypothetical, including standing or walking for no more than two hours per day, were limited to only occasional pushing, pulling, reaching with the left arm—instead of the limitation, specified by the ALJ, for frequent pushing, pulling, and reaching with the left arm—could perform the three sedentary jobs cited by the VE in response to the ALJ's second hypothetical. (*Id*.) The VE responded that Plaintiff's counsel's added restriction of occasionally pushing, pulling and reaching would rule out the sedentary jobs she previously cited and sedentary work generally. (*Id*.)

## V.    ALJ Sharrard's Decision And Appeals Council Review

Following the five-step process, *see infra* Legal Standards Section II, ALJ Sharrard determined that Plaintiff was not disabled from the January 1, 2015 AOD through the February 9, 2018 date of the decision. (R. 17-26.) First, the ALJ found that Plaintiff's severe impairments were status post arthroscopy of the right knee and partial meniscectomy in November 2013, status post anterior cervical discectomy and fusion at C5-6, lumbar radiculopathy with a herniated nucleus pulposus in 2014, left shoulder labral tear, bursitis of the left shoulder, and

status post arthroscopy in November 2015. (R. 19.) The ALJ further found that Plaintiff had non-severe impairments of migraines, gastroesophageal reflux disorder and asthma. (R. 20.)

The ALJ noted Plaintiff's testimony that "she could barely walk, stand, or sit for any length of time, and barely perform activities of daily living, such as chores, on a regular basis." (R. 22.) He found that her statements about the intensity, persistence and limiting effects of her impairments were inconsistent with the medical evidence. (*Id*.)

The ALJ gave some weight to the consultative opinion of Dr. Revan of mild to moderate limitations due to back pain because it was vague. (R. 23.) However, the ALJ noted that the residual functional capacity ("RFC") he assigned to Plaintiff is consistent with his interpretation of Dr. Revan's opinion. (*Id*.)

The ALJ gave little weight to the opinions of Plaintiff's primary care physician, Dr. Kavuri, as set forth in her June 1, 2017 Medical Source Statement, because the record reflected only three visits that Plaintiff had with Dr. Kavuri and because Dr. Kavuri's "extreme sitting, standing, and walking limitations" were not supported by the medical record. (R. 23.) He also gave little weight to the opinion of Plaintiff's surgeon, Dr. Katzman, as set forth in his November 17, 2015 Medical Source Statement, because it was inconsistent with Dr. Katzman's own treating notes after surgery. (R. 24.) The ALJ gave no weight to Dr. Mikelis's December 14, 2015 opinion that Plaintiff was totally disabled since the issue of disability is reserved for the Commissioner. (*Id*.)

The ALJ determined that Plaintiff's RFC was limited to light work,[15] except that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours; stand and/or

---

[15] Light work involves lifting and carrying 20 pounds occasionally and 10 pounds frequently. *See* 20 C.F.R. § 404.1567(b). It also generally requires standing/walking at least six hours a day and sitting the remainder of the day. *See* Social Security Ruling 83-106, at **5-6 (1983 WL 31251).

walk for 2 hours; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, stoop, crouch, kneel, crawl and balance; frequently reach, push and pull with the left upper extremity, which is the non-dominant upper extremity; frequently push or pull with the lower extremities; frequently rotate and flex her neck; and have occasional exposure to extreme heat and extreme cold. (R. 20.) Based on the testimony of the VE, the ALJ found that Plaintiff could not perform her past relevant work, but could perform the following sedentary jobs: (1) cutter/paster, (2) call out operator; and (3) document specialist. (R. 25, 72.)

Following the ALJ's February 9, 2018 decision, Plaintiff sought review from the Appeals Council, which denied her request on January 30, 2019. (R. 1-5.)

## LEGAL STANDARDS

### I.   Standard Of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does [the Court] determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejeda v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating

and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, No. 17-CV-01366, 2019 WL 1782629, at *1 (2d Cir. Apr. 24, 2019) (summary order) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks omitted)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.   Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

20

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. §§ 404.1520(a)(4).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4). After the first three steps (assuming that the claimant's impairments do not meet or medically equal

any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id*.

### III.   The Treating Physician Rule[16]

An ALJ must follow specific procedures "in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ must decide whether a treating physician's opinion is entitled to controlling weight. *See id.* The ALJ must give "controlling weight" to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician

---

[16] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claims were filed before that date, to the extent that the regulations regarding medical opinion evidence are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017.

is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, [including] the opinions of other medical experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the ALJ must determine how much weight, if any, to give it. *Estrella*, 925 F.3d at 95. "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (quoting *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir. 1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following, nonexclusive factors: "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted).

At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting them."). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record"

assures the Court "that the substance of the treating physician rule was not traversed," the Court

should affirm. *Id.* (citing *Halloran*, 362 F.3d at 32).

**DISCUSSION**

Plaintiff argues that her case should be remanded because: (1) the ALJ erred in finding

that she had the RFC to perform light work; (2) the ALJ failed to properly evaluate the

assessments of her treating physician and the treating orthopedist; (3) the ALJ failed to properly

evaluate the testimony of the VE; and (4) the ALJ erred in finding that Plaintiff's migraines and

asthma were non-severe impairments. (Joint Stip. at 39-70.) For the reasons set forth below, the

Court finds that the ALJ violated the treating physician rule and that the case should be remanded

on that basis. In addition, the Court finds that the ALJ's treatment of the opinion evidence

resulted in an evidentiary gap, which independently requires remand.

I.     **The ALJ Erred In Application Of The Treating Physician Rule**

    A.     **Dr. Kavuri**

The ALJ gave Dr. Kavuri's June 2017 opinion little weight because the record included only

three visits with her and the ALJ found that the "extreme sitting, standing and walking

limitations" were not supported by the treatment notes. (R. 24.) However, the ALJ did not explain

why she chose not to credit other key aspects of Dr. Kavuri's opinion, including that Hogans could

not move her neck well, could only occasionally push, pull and reach and that her pain was severe

enough to interfere with attention and concentration. Even though the ALJ was entitled to

consider the length and frequency of treatment as one factor in assessing the weight to be

assigned to the treating physician's opinion, she first was required to explain her determination

for affording the opinion less than controlling weight. *See Estrella*, 925 F.3d at 95. The ALJ's failure to do so is a violation of the treating physician rule.[17]

Moreover, even if the ALJ was entitled to assign the opinion less than controlling weight, in determining the weight to assign, the ALJ was required to consider other factors, such as the amount of medical evidence supporting the opinion and the consistency of the opinion with the remaining medical evidence, and give good reasons for the weight assigned. *See Estrella*, 925 F.3d at 95; *see also Rivera v. Colvin*, No. 11-CV-07469 (LTS) (DF), 2014 WL 3732317, at *35 (S.D.N.Y. July 28, 2014) (ALJ erred by, *inter alia*, "fail[ing] to explore the extent to which multiple aspects of the treaters' stated opinions were consistent with the overall record."). Notably, in discussing the medical evidence prior to assigning weight to opinions, the ALJ recognized that Hogans's medical records frequently documented tenderness, pain and limited range of motion in her neck and shoulders and that the notes from Dr. Kavuri were consistent with notes from specialists. (R. 21-22.) Nonetheless, the ALJ rejected Dr. Kavuri's opinion relating to Hogans's use of her neck and shoulders without explaining her reasons for doing so. The Court finds that this was error. *See Pataro v. Berryhill*, No. 17-CV-06165 (JGK) (BCM), 2019 WL 1244664, at *17 (S.D.N.Y. Mar. 1, 2019) (remanding where ALJ ignored treating physician's opinion as to certain of the plaintiff's physical limitations; did not incorporate those limitations into the plaintiff's RFC; and did not provide any reasons for failing to do so), *report and recommendation adopted*, 2019

---

[17] To the extent that the Commissioner suggests that the ALJ discounted the entirety of Dr. Kavuri's opinion based on Dr. Kavuri's treatment notes (Joint Stip. at 55), the Court disagrees. The ALJ referred only to Dr. Kavuri's assessments in sitting, standing and walking. (R. 23.) The Commissioner also argues that, "while not acknowledged by the ALJ[,]" Dr. Kavuri's opinion was internally inconsistent and properly was rejected on that basis. (Joint Stip. at 55.) However, "[a] reviewing court may not accept appellate counsel's post hoc rationalizations for agency action." *Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009).

WL 1244325 (S.D.N.Y. Mar. 18, 2019)). Because the VE testified that there would be no work for a person limited to sedentary work[18] who could only occasionally push, pull and reach (R. 77), the ALJ's failure to comply with the treating physician rule was not harmless error. *See Pataro v. Berryhill*, No. 17-CV-6165 (JGK) (BCM), 2019 WL 1244664, at *17 (S.D.N.Y. Mar. 1, 2019), *report and recommendation adopted*, 2019 WL 1244325 (S.D.N.Y. Mar. 18, 2019) (an error is harmless where consideration of a physician's opinion "would not have changed the outcome of the ALJ's decision") (quoting *Walzer v. Chater*, 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995)).

The Court also finds that the ALJ erred in weighing Dr. Kavuri's October 2017 opinion. The ALJ stated that she gave the opinion "little weight" because the term "debilitating" failed to assess functioning. (R. 24.) The ALJ then explained that if the word was being used as an equivalent to disabling, determination was reserved to the Commissioner, but gave the letter "at least some credence" because Dr. Kavuri was a treating source. (*Id*.) It is unclear from the ALJ's decision what credence the ALJ gave to the opinion given the lack of clarity around Dr. Kavuri's meaning of "debilitating." In any event, if the ALJ thought that the opinion required further explanation, she should have sought clarification before rejecting it. *See Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) ("[I]f a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician.").

---

[18] The parties disagree about the ALJ's characterization of the RFC determination as "light" rather than sedentary work. (*See* Joint Stip. at 39-45.) Regardless, there is no dispute that the three alternative jobs identified by the VE at step five are classified as sedentary. (*See id*.)

B.    **Dr. Katzman**

With respect to Dr. Katzman, Hogans's treating orthopedist, the ALJ also gave his opinion little weight because it was inconsistent with other medical evidence, including his own treatment notes following surgery. (R. 24.) The ALJ found that, after surgery, Hogans's shoulder improved and "[a]t worse, she still had limited range of motion accompanied by some pain" and points to treatment notes from four to five months later show greater range of motion. (*Id*.)

Dr. Katzman's opinion was given at a follow-up visit one week after Hogans's surgery and, thus, it is not surprising that Dr. Katzman found greater limitations at that time. Nonetheless, "an ALJ may rely on notations showing improvement in a plaintiff's condition when weighing the medical opinion evidence in the record." *Morais v. Comm'r of Soc. Sec.*, No. 16-CV-01487 (WBC), 2018 WL 1441310, at *6 (N.D.N.Y. Mar. 22, 2018) (citing *Cohen v. Comm'r of Soc. Sec.*, 643 F. App'x 51, 53 (2d Cir. 2016) (ALJ properly afforded treating source opinion less than controlling weight where treatment records showed improvement in plaintiff's condition)).

Ultimately, the Court need not decide whether the ALJ properly weighed this opinion because I find that remand is required on other grounds. However, on remand, the ALJ should consider whether to seek an updated opinion from Dr. Katzman, particularly given the gap in the evidentiary record created by the ALJ's rejection of other opinion evidence, discussed in Discussion Section VI below. *Accord Veralyn B. v. Comm'r of Soc. Sec.*, No. 18-CV-00978 (ATB), 2019 WL 5853388, at *8 (N.D.N.Y. Nov. 8, 2019) (recognizing ALJ's discretion regarding whether to seek updated or medical opinion evidence but explaining how resulting evidentiary gap prevented proper RFC determination).

## II.    The ALJ's Rejection Of The Opinion Evidence Created An Evidentiary Gap In The Record

Even if the ALJ properly discounted the treating physicians' opinions, the Court finds that "[t]he ALJ's rejection of the opinions created an evidentiary gap in the record requiring remand." *Zayas v. Colvin*, No. 15-CV-06312 (FPG), 2016 WL 1761959, at *4 (W.D.N.Y. May 2, 2016). The ALJ discredited all the opinion evidence in the record related to Hogans's ability to use her upper extremities, including her ability to reach, push and pull. In addition to giving little weight to the opinions of Hogans's treating physicians, the ALJ rejected the portion of Dr. Revan's opinion regarding Hogans's gross motor activities in the upper extremities, finding that it was "belied by her finding no sensory deficits, full strength and deep tendon reflexes." (R. 23.) However, "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Kemp v. Comm'r of Soc. Sec.*, No. 19-CV-00282 (FPG), 2020 WL 5016684, at *3 (W.D.N.Y. Aug. 25, 2020) (internal citation omitted); *see also Bridges v. Comm'r of Soc. Sec.*, No. 19-CV-00029, 2020 WL 1986919, at *4 (W.D.N.Y. Apr. 27, 2020) ("Although an RFC finding need not track any one medical opinion, the ALJ is not free to selectively pick and choose only evidence supporting her already-determined RFC, and the ALJ is not permitted to reinterpret the doctor's own medical findings in favor of her own lay reading of the medical data.").[19]

The Court is aware that, "under certain circumstances, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *Santillo v. Colvin*, No. 13-CV-08874 (GHW), 2015 WL 1809101, at *10 (S.D.N.Y. Apr. 20, 2015).

---

[19] Some courts frame this issue as one of legal error as opposed to a lack of substantial evidence. *See, e.g., Legall v. Colvin*, No. 13-CV-01426 (VB), 2014 WL 4494753, at *4 (S.D.N.Y. Sept. 10, 2014).

However, as the ALJ recognized, Hogans has multiple severe impairments and has undergone several surgeries. (R. 23.) Thus, this is "not a case where the medical evidence shows relatively little physical impairment such that the ALJ can render a common sense judgment about functional capacity." *See Grimmage v. Comm'r of Soc. Sec.*, No. 17-CV-06570 (MAT), 2018 WL 4103184, at *3 (W.D.N.Y. Aug. 29, 2018) (ALJ's conclusion that plaintiff, who had undergone multiple surgeries, was capable of frequent reaching, handling and fingering not supported by substantial evidence when no medical opinion supported the ALJ's RFC assessment). Moreover, it is not clear from the ALJ's decision what medical evidence she relied on to support her RFC determination that Hogans could frequently reach, push and pull with the left upper extremities. (R. 23.) "When an ALJ does not connect the record evidence and RFC findings or otherwise explain how the record evidence supported his RFC findings, the decision leaves the court with many unanswered questions and does not afford an adequate basis for meaningful judicial review." *Bridges*, 2020 WL 1986919, at *5 (internal citation and quotation marks omitted); *see also Izzo v. Saul*, No. 18-CV-09681 (NSR) (JCM), 2019 WL 8989863, at *17 (S.D.N.Y. Dec. 9, 2019), *report and recommendation adopted*, 2020 WL 1189095 (S.D.N.Y. Mar. 11, 2020) ("Substantial evidence must support the ALJ's RFC determination, and the failure to point to medical evidence supporting the RFC determination is a ground for remand.") (citing cases).

For these reasons, the Court finds that, even if the ALJ properly weighed the opinions of the treating physicians, remand is required.

### III.     Plaintiff's Remaining Arguments

Plaintiff also argues that the ALJ erred in her evaluation of the VE's testimony and in her step two determination that Hogans's migraines and asthma were not severe impairments. (Joint

Stip. at 6-7.) However, because I find that the ALJ committed legal error requiring remand, and the ALJ's analysis on these points may change on remand, I decline to reach these issues. *Accord Morales v. Colvin*, No. 13-CV-06844 (LGS) (DF), 2015 WL 13774790, at *23 (S.D.N.Y. Feb. 10, 2015) (court need not reach additional arguments).

## CONCLUSION

For the foregoing reasons, judgment on the pleadings is GRANTED in favor of the Plaintiff, and is DENIED as to the Commissioner, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion.

DATED:      September 11, 2020
            New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**